**COMMUNICATIONS SATELLITE CORPORATION**

v.

**COMCET, INC.**

Civ. No. 20343.

United States District Court
D. Maryland.
June 5, 1969.

**560**

———◆———

Leslie D. Taggart, Frank J. Colucci and Watson, Leavenworth, Kelton & Taggart, and George W. MacDonald, Jr., New York City, William H. Berman, Washington, D. C., and Russell R. Reno, Jr., and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Joe A. Sutherland and William L. Morrison, Chicago, Ill., and Michael P. Crocker, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is a civil action for alleged infringement of plaintiff's trade name and registered service mark COMSAT and for unfair competition. Jurisdiction concededly exists. Plaintiff seeks injunctive relief,[1] but concedes that it has not proved any damages.

### FINDINGS OF FACT

#### Plaintiff

1. Communications Satellite Corporation (plaintiff) is a District of Columbia corporation, incorporated on February 1, 1963, under the authority of the Communications Satellite Act of 1962 (the Act), 76 Stat. 419, 47 U.S.C.A. § 701 et seq. The Act declares that it is the policy of the United States to establish as expeditiously as practicable a "commercial communications satellite system", and provides for the creation of a private corporation, subject to appropriate governmental regulation by the Federal Communications Commission (FCC).

2. Plaintiff is a communications common carrier, which provides global communications service via space satellite for the transmission of telephone (voice), television, telegram, teletype and data traffic. It is the only entity in the United States authorized to provide such service, but it competes with companies which offer similar communications services via microwave facilities, high frequency radio or cable. Plaintiff is not authorized by the FCC to provide any communications services via satellite for use between points within the continental United States.

3. Plaintiff is primarily a common carrier's common carrier, since it is authorized by the FCC to sell its satellite communication services only to other communications common carriers and to the Federal Government.[2] The Act does not prohibit the FCC from authorizing plaintiff to provide its communications services directly to others, but the FCC has not done so. Plaintiff sells its serv-

---

1. Plaintiff seeks to enjoin defendant "from using 'COMCET, INC.', 'COMCET' and any similar notation in the advertising, offering for sale and sale of its securities to the public, from using 'COMCET, INC.', 'COMCET' and any similar notation in the advertising or promotion of any products including communications computers which it proposes to develop, manufacture and market, and from using 'COMCET, INC.', 'COMCET' and any similar notation in connection with its

business, including its prospective business of developing, manufacturing and servicing computers, which computers it may in the future develop, and from otherwise competing unfairly with plaintiff."

2. Plaintiff's ancillary activities include research and development at its laboratories and the furnishing of technical assistance to its customers and their customers.

ices to only six customers: five communications common carriers (A. T. & T., I. T. & T., W. U. Int'l, RCA Global Organizations and Hawaii Telephone Co.) and NASA. Plaintiff's customers, except NASA, are also stockholders.

4. Plaintiff does not manufacture or sell any products commercially, and is not authorized by the Act to do so.

5. Plaintiff has used COMSAT as its trade name since early 1964, and since October 1964 has used COMSAT as a service mark for its communications services via satellite. COMSAT is an acronym made up of the first syllable of two descriptive words: "Communications" and "satellite".

6. Plaintiff registered its service mark COMSAT in the United States Patent Office for communication services via satellite on May 2, 1967.[3] On December 5, 1967, it made a similar registration[4] of C☉MSAT using a globe as a substitute for the letter "O".

7. Plaintiff has spent about a million dollars over the years in promoting its communications services via satellite and in recruiting personnel, using its trade name and mark in such promotion and recruiting. Plaintiff's sales of its services have amounted to many millions of dollars.

8. Plaintiff's stock has been traded on the New York Stock Exchange since September 8, 1964. It is listed in the reports of the New York Stock Exchange results as Comsat.

9. Plaintiff has been referred to as COMSAT or Comsat in national magazine articles and in articles which have appeared in the daily press throughout the country over the past five years.

10. Since plaintiff does not sell its services to the general public, it does little or no advertising. Nevertheless, as a result of plaintiff's promotional activities and the publicity it has received, COMSAT has become recognized throughout the United States as identifying and distinguishing plaintiff and its communications services.

*Defendant*

11. Comcet, Inc. (defendant) was incorporated in Maryland on February 5, 1968. It is one of a family of companies related to Comress, Inc., which was incorporated in Maryland in 1962. All of the related companies—Comress, Inc., Computer Network Corporation (Comnet), Commed, Inc., Comcet, Inc., and Computer Microtechnology, Inc.—are engaged in various segments of the computer industry.[5]

12. Defendant is engaged in the business of developing, manufacturing and selling computers and related hardware and software. It has introduced and is now demonstrating and marketing the Comcet 60 Computer Communications System, which combines a computer, memory and interfacing units, monitoring equipment and software. It is designed to handle the communications requirements of a multiterminal system,[6] and thus permit a large and relatively

---

3. Registration No. 828,366, in Class 104.

4. Registration No. 841,095, also in Class 104.

5. Satellite Computing, Inc., generally known as Satcom, is also related to the Comress group. Satcom is a Virginia corporation, which provides certain services utilizing satellite computers. The term satellite computer is a recognized term in the computer industry and refers to a particular type of computer and not to space satellites used for any purpose. Defendant's president has been a director of Satcom since its incorporation. Com-

net, which operates a time-sharing computer network, has furnished to Satcom computer time, which was not being used by Comnet, in return for which Comnet will be entitled to become a stockholder of Satcom to the extent of 51% of its stock.

6. Defendant's computers and related equipment are designed to handle a wide variety of communications circuits and terminal devices, including teletypewriter, voice grade and broad band circuits, as well as remote punch card and line printer units, time-sharing terminals, and graphic display terminals.

expensive data processing computer, such as an IBM 360 or a Univac 1108 (with both of which it is compatible) to realize more fully its data processing potential. Defendant markets its computers through its own sales staff to users of large data processing systems.

13. The Comcet 60 System is priced at about $200,000. A decision to purchase one or more of defendant's computers will be made by executives and top technical personnel after extensive contact and work with defendant's personnel.

14. Defendant's president, Lee Johnson, is widely known in the computer field; he and other members of defendant's management and technical personnel have had many years of experience with computers.

15. In January or February 1968, Johnson and Donald Herman, defendant's chairman, chose Comcet, Inc., as defendant's corporate name, intending to use Comcet or COMCET as its trademark. Comcet is an acronym for computer communications engineering technology. The syllable "Com" was chosen to suggest defendant's products (computers) and its relationship to the Comress family of companies. The letter "c" in the second syllable was chosen because the word "communications" describes the type of computers to be manufactured; the "e" and "t" and the words they represent were chosen to round out a euphonious name, which would aid defendant in establishing a lead in its particular and narrow market in competition with its potential competitors, such as IBM, Control Data, Sperry Rand, General Electric and Honeywell. Some of those companies now make devices which perform somewhat the same function as the Comcet 60, and some or all of those companies may be expected in the near future to produce competitive computers. Defendant did not obtain a trademark search report of similar names. The evidence shows, however, that many two-syllable words having "com" as the first syllable have been registered. When defendant's chairman and president decided to adopt Comcet as defendant's name and trademark, they knew that plaintiff's trade name and service mark was COMSAT, but they did not believe that they would ever be in competition with COMSAT and did not adopt Comcet or COMCET with any intention of using or obtaining the benefit of whatever good will plaintiff has established for its name and service mark COMSAT.

16. Defendant issued a prospectus on October 15, 1968, in which a certain amount of its common stock was offered to the public at a stated price.[7] Before the prospectus was issued, the Securities and Exchange Commission suggested to defendant by letter dated September 13, 1968, that: "A parenthetical phrase disclosing that the registrant is not related to 'Comsat', Communications Satellite Corporation, should be inserted immediately following the registrant's name on the cover page of the prospectus." Defendant decided to follow rather than contest the SEC suggestion, and inserted at the head of its prospectus immediately after its corporate name: "Not related to 'Comsat', Communications Satellite Corporation".

17. Defendant's stock is traded over-the-counter and is generally referred to as Comcet.

18. Promptly after the prospectus was issued, plaintiff complained to defendant of its use of the name Comcet.

19. The 90-day period following the issuance of defendant's prospectus expired one day before this lawsuit was filed. Defendant, therefore, had not advertised any of its products prior to the commencement of the suit, but had prepared "prototype hardware", to which

---

7. All of the stock referred to in defendant's prospectus has been sold to the public, except that reserved for designated persons.

it had attached the mark COMCET 60, and had prepared elaborate advertisements for Comcet 60 systems, which were published in "Datamation", a magazine of the computer industry, in its April 1969 issue. Copies of this advertisement have also been circulated among prospective customers during the year 1969.

20. Defendant has received one firm order for six computers from Comnet, one of its related companies. Two independent companies have agreed orally to purchase computers from defendant but have not yet signed formal orders.

### The Relationship Between the Communications and Computer Industries

21. Plaintiff and defendant are in different but sometimes interrelated industries.[8]

22. In 1967 plaintiff, in association with IBM, made tests of high speed transmission of data by computers via communication satellite. These tests have demonstrated the potential of plaintiff's satellite system for high speed transmission of data from computer to computer. Plaintiff's communications services are presently utilized by NASA for the transmission of data from computer to computer, and these operations are now being expanded.

23. In December 1968, pursuant to the rules of the FCC, plaintiff established its tariff for wide band (48 KHz channels) communication services via satellite suitable for the high speed transmission of data, and plaintiff is presently marketing such services.

24. Plaintiff used computers (a) to develop information which controls launch maneuvers of a satellite during the period just prior to, during, and just after a launch of a new satellite, (b) to develop pointing data for earth stations

to enable them to find the satellite in orbit, lock on to it, and work with it, and (c) to develop access, a new technique of using the satellite for more than one user, or set of users, on a single communications channel.

25. Data sent from a computer in the United States to a computer in Europe by way of plaintiff's satellite travels from the original computer in the United States through some communications service, such as A. T. & T., to plaintiff's earth station in the United States; thence it is transmitted via plaintiff's satellite to plaintiff's earth station in Europe; thence it is transmitted by a communications carrier to the receiving computer in Europe. If the owner of the receiving computer purchases one of defendant's computers, it will be used as an adjunct to the receiving (data processing) computer, and not as part of plaintiff's communications services.

### DISCUSSION, ULTIMATE FINDINGS AND CONCLUSIONS

The Lanham Act (the Act) as amended October 9, 1962, provides in § 32, 15 U.S.C.A. § 1114:

"(1) Any person who shall, without the consent of the registrant—

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; * * * shall be liable in a civil action by the registrant * *."

Before the 1962 Amendment, § 32(1) included the words "purchasers as to the source or origin of such goods or services" after the word "deceive". The legislative history makes it clear that the reason for eliminating the word

8. In 1966 (Docket No. 16979) the FCC considered the interdependence of computers and communications services, but none of its findings are important on the issues in this case.

"purchasers" was because "the provision actually relates to potential purchasers as well as to actual purchasers". See particularly Sen.Rep.No. 2107, Sept. 18, 1962, U.S.Code Cong. & Adm.News, pp. 2847, 2850, 2851.

The term "mark" is used in the Lanham Act to include service marks as well as trademarks. § 45 of the Act, 15 U.S.C.A. § 1127.

■ A trade name may, if used as a trademark to identify and distinguish goods or services, also be a trademark. When a trade name has acquired trademark status, it is entitled to protection from infringement the same as any other trademark. Little Tavern Shops v. Davis, 116 F.2d 903 (4 Cir. 1941).

The development of the law with respect to infringement of trademarks (whether for goods or services) and trade names is set out at length in the Restatement of Torts 2d, Tentative Draft No. 8, April 22, 1963, hereinafter referred to as T.D. 8. That draft was discussed at the 40th Annual Meeting of the A.L.I. on May 23, 1963, and the several sections were approved with a few modifications. See A.L.I. Proceedings 1963, pp. 138–194, and 321–323.

Section 717 of T.D. 8, headed "General Statement of Conditions of Infringement", as so modified (op. cit. pp. 156, 163, 164), states in pertinent part:

"(1) One infringes another's trademark, collective mark or tradename if, without a privilege to do so, he uses on or in connection with his goods, services or business a designation which so resembles the other's previously used mark or tradename as to be likely to cause confusion, mistake or deception by leading prospective purchasers to believe that

"(i) the actor's goods or services are those of the other, or

"(ii) the actor's goods or services emanate from the same source as the other's goods or services, or

"(iii) the actor's goods or services are approved or sponsored by the other, or

"(iv) the actor's business is the business of, or is in some manner associated or connected with, the other,

even though the actor does not use the designation with a purpose to deceive."

As so modified, § 717 states the prevailing law.

■ For the reasons stated more fully below, under the discussion of § 729(c–d) of T.D. 8, this Court finds that plaintiff and defendant utilize different marketing channels, and are not competitors. However, the rule stated in § 717 recognizes that rights in a mark may be enforced not only when the alleged infringer is using them on or in connection with goods or services which are in competition with goods or services offered by the owner of the mark, but also in appropriate cases where the goods or services offered by the respective parties are not in competition.[9]

■ The factors which should be considered in determining whether or not there has been infringement in this case are set out in §§ 729 and 731 of T.D. 8. The only modifications made to those proposed sections at the 1963 meeting were to eliminate the words "for goods or services" after the word "trademark" at the beginning of each section, since the word trademark is defined in § 715 as a mark used for goods or services. See also 15 U.S.C.A. § 1127. Brackets

9. See American Steel Foundries v. Robertson, 269 U.S. 372, 383, 46 S.Ct. 160, 70 L.Ed. 317 (1926); Durox Co. v. Duron Paint Mfg. Co., 320 F.2d 882 (4 Cir. 1963); John Walker & Sons, Ltd. v. Tampa Cigar Co., 222 F.2d 460 (5 Cir. 1955); Eskimo Kooler Corp. v. Eskimo Pie Corp., 235 F.2d 3 (7 Cir. 1956); Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540 (1 Cir. 1957); Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3 Cir. 1955); Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433, 2 A.L.R.3d 739 (5 Cir. 1962); Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7 Cir. 1963).

surround the words so eliminated in the sections of T.D. 8 as set out below.[10][11] Some of the factors listed in those sections overlap, but they will be considered seriatim, beginning with those listed in § 729, dealing with "Resemblance of Marks".

(a) The name and mark COMSAT or C⊙MSAT on the one hand and Comcet or COMCET on the other do not look alike. They are, however, often pronounced very much alike, since the first syllable of each is usually accented. Both are weak marks. Durox Co. v. Duron Paint Mfg. Co., 320 F.2d 882 (4 Cir., 1963). Both are acronyms. The first syllable of each is derived from the first syllable of a word in common

use, although the words—communications and computer—are different words, with different meanings and connotations. The syllable "com" is used in the names or marks of other companies in the separate but sometimes related fields of communications and computers.

(b) Those who chose and adopted Comcet as a name and trademark did not intend to derive any benefit from plaintiff's reputation or good will. See Finding 15, above. They knew of plaintiff's existence and business when they chose the name, and knew that there was a similarity in the pronunciation of the names, but did not believe that there was any likelihood of confusion, even when

10. "§ 729. FACTORS IN DETERMINING INFRINGEMENT—RESEMBLANCE OF MARKS.

"In determining whether or not an actor's designation infringes another's trademark [for goods or services], collective mark, certification mark or tradename under the rule stated in § 717, the following factors, among others, concerning the designation and the mark or name are important:

"(a) The degree of resemblance between the designation and the other's tradename, trademark or certification mark in

"(i)    appearance;

"(ii)    pronunciation of the words involved;

"(iii)    translation of the words involved;

"(iv)    verbal translation of the pictures or designs involved;

"(v)    suggestiveness, connotation or meaning of the actor's designation and the tradename, trademark or certification mark involved;

"(b)    the intent of the actor in adopting and using the designation;

"(c)    the similarity of circumstances and conditions surrounding the purchase of the goods or services involved;

"(d)    the degree of care likely to be exercised by purchasers of the goods or services involved."

11. "§ 731. FACTORS IN DETERMINING INFRINGEMENT-RELATIONSHIP BETWEEN INVOLVED GOODS, SERVICES OR BUSINESS.

"In determining whether or not an actor's designation infringes another's

trademark [for goods or services], collective mark, certification mark or tradename under the rule stated in § 717, the following factors, among others, concerning the goods, services or business are important:

"(a)    the likelihood that the actor's goods, services or business will be confused with or mistaken for those of the other;

"(b)    the likelihood that the other may expand his business so as to compete with the actor;

"(c)    the extent to which the goods or services involved have common purchasers or users;

"(d)    the extent to which the goods or services involved are sold by the same marketing methods and marketed through the same channels;

"(e)    the relation between the functions and uses of the goods or services involved;

"(f)    the degree of distinctiveness of the mark or trade name;

"(g)    the degree of attention usually given to trade symbols in the purchase of the goods or services involved;

"(h)    the length of time during which the actor has used the designation;

"(i)    the intent of the actor in adopting and using the designation;

"(j)    the celebrity of the mark or tradename involved."

the possibility was suggested to them by the SEC and by plaintiff.

(c)–(d) The circumstances and conditions surrounding the purchase of plaintiff's services by its customers and of defendant's computers and related hardware and software by its prospective customers are quite dissimilar, even when defendant solicits business from the communications common carriers and NASA, who are plaintiff's only customers. The circumstances would continue to be dissimilar even if plaintiff is allowed to offer its services to other business or government entities, and if defendant develops a broader line of "hardware" and "software". From time to time persons who purchase defendant's computers or systems may use various communications services, including plaintiff's. And one of plaintiff's customers—a communications common carrier, NASA or some other agency of the Federal Government—may in the future purchase one or more computers or systems from defendant, but they would not be used as a substitute for or as part of plaintiff's services. In view of the large amounts of money and the high technical competence required of those who purchase and use what is offered by the parties, the representatives of the prospective purchasers are likely to exercise a high degree of care in learning all the details.[12]

The factors listed in § 731, see n. 11, are important in considering the relationship between the goods, services and business of the respective parties.

(a) For the reasons discussed above, particularly in (c)–(d) under § 729, there is no likelihood that defendant's goods, services or business will be confused with or mistaken for plaintiff's.

(b) It is not likely that either will expand its business to compete with the other.

(c) Plaintiff argues that everyone in the United States is a potential indirect customer of plaintiff, since all may view pictures on television screens, or may hear sounds which have been transmitted via plaintiff's satellites. This is an unwarranted extension of the meaning of the word customer.

Plaintiff also argues that many businesses are indirect customers of plaintiff, since they use the services of one or more of plaintiff's direct customers, who in turn may use plaintiff's services. Plaintiff's marketing representatives have been in contact with a number of companies throughout the United States which have substantial communications needs, including data traffic. The purpose of these contacts is to interest the companies in utilizing plaintiff's services and then direct them to the appropriate common carrier from which plaintiff's services can be purchased. Some 16 large companies have been contacted both by plaintiff (to urge them to require or request the carrier they employ—A. T. & T., I. T. T. etc.—to make use of plaintiff's services) and by defendant (for the purpose of soliciting sales of its computers). But they normally interview different men, in different divisions of the companies, all of whom are highly sophisticated and knowledgeable in the communications and computer fields. Even though plaintiff may urge some concerns to use directly or indirectly plaintiff's satellites in transmitting data from one computer to another, no one who contemplates purchasing defendant's goods or plaintiff's services is likely to confuse the two.

(d) As found above, the goods and services involved are not marketed through the same channels, or sold by the same marketing methods, unless interviews with sophisticated personnel of large enterprises may be considered the same marketing method.

(e) Plaintiff furnishes communications services via satellite, which may

---

12. See Durox Co. v. Duron Paint Mfg. Co., supra, 320 F.2d at 884, 885.

include transmission of data from computer to computer. Defendant manufactures and sells computers, which may be used to receive, sort and store data which has been transmitted part of the way by plaintiff's satellite services,[13] as well as for other purposes. In particular instances, plaintiff's services and defendant's computers may both be used by the same customer, but they are not likely to be confused.

(f) As noted in (a) under § 729, plaintiff's mark is a weak mark.

(g) The highly sophisticated and technical nature of the computer business reduces the importance of trade symbols to defendant's potential customers. The common carriers and government officials who are plaintiff's customers are equally knowledgeable.

(h) Defendant has used Comcet as its name since its incorporation early in 1968, but has used it as a trademark only since January 1969, when the 90-day period following the public offering of its stock expired. Defendant advances as an equity in its favor that it is a small company competing with giants, that it has invested substantial sums in bringing its Comcet 60 System to the attention of persons responsible for buying and using large computers, and that it would seriously damage its competitive position to have to change its name now. This appealing argument is minimized by the fact that plaintiff objected to defendant's use of the name and mark before the mark was used in advertising or the name was used to any considerable extent except in the stock offering. Defendant could then have adopted some other name or mark without sustaining the loss of its intervening promotional costs.

Nonetheless, plaintiff is not entitled to prevent defendant's use of the name and mark Comcet unless such use would constitute an infringement of plaintiff's mark, applying the principles now being discussed.

(i) As noted above in (b) under § 729 and in Finding 15, defendant did not intend to appropriate any part of plaintiff's goodwill or to derive any benefit from plaintiff's reputation.

(j) Plaintiff's services are celebrated; its name and mark are less well known.

■ Defendant has not used its trademark COMCET or its trade name Comcet, Inc., in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. Defendant therefore has not violated § 32(1) of the Lanham Act, 15 U.S.C.A. § 1114. Nor has there been any infringement under the principles stated in § 717(1) of T.D. 8. Prospective purchasers are not likely to believe: (i) that defendant's goods are those of plaintiff, nor (ii) that they emanate from the same source as plaintiff's services, nor (iii) that they are approved or sponsored by plaintiff, nor (iv) that defendant's business is the business of, or is associated or connected with plaintiff's business.

Plaintiff suggests, however, that the adoption of the name Comcet by defendant, the offering of its stock to the public, and the consequent trading of such stock over-the-counter, has tended to confusion and mistake in the minds of investors who may have bought stock in defendant thinking they were buying stock in plaintiff, and that this may cause some future damage to plaintiff's corporate image. Plaintiff also argues that the use of the name Comcet in defendant's publicity releases and otherwise, although such use may not violate § 32(1) of the Lanham Act, is likely to cause confusion or mistake in the minds of the public generally, even if they are not prospective purchasers of the goods,

---

13. Most such data are now transmitted by cable rather than by plaintiff's services.

services or securities of either plaintiff or defendant.

The evidence on the issue of possible confusion in the minds of investors consists of only a few items: (1) The suggestion of the SEC, acquiesced in by defendant, that it include at the head of its prospectus, under the name Comcet, Inc., the words "Not related to 'Comsat', Communications Satellite Corporation"; (2) the testimony of a NASA engineer that his stockbroker from time to time buys for him new issues and other stocks without previous order; that the broker reported to the witness he had bought some shares of Comcet, Inc., and the witness momentarily thought he had bought stock in plaintiff, but quickly realized the difference; and (3) the testimony of the compliance analyst of the firm which distributed defendant's stock offering that no incident of any confusion had been reported to them. The last item carries little weight, but on the whole evidence the Court finds that there is virtually no likelihood of confusion in the minds of investors. Moreover, no damage or likelihood of damage to plaintiff's image in the minds of investors has been proved. The Lanham Act does not seek to protect investors, as such. On the other hand, common law principles may in a proper case protect investors, as well as other members of the public, from confusion, mistake or deceit arising out of the appropriation by one concern of the trade name of another. The evidence in this case, however, does not support a claim to any such relief.

Assuming, without deciding, that any right of action may lie, upon a proper showing, for damage to a plaintiff's corporate image or goodwill in the minds of the man or woman in the street, as distinguished from prospective purchasers of the plaintiff's goods, services or securities, no such showing has been made here.

Defendant has not been guilty of any unfair competition with plaintiff.

Judgment will be entered in favor of the defendant, with costs.